### In re ANDERSON'S WILL.

(*Supreme Court, General Term, Fifth Department.* October 19, 1888.)

WILLS—TESTAMENTARY CAPACITY—INTOXICATION.

A physician testified that in November testatrix was temporarily insane from the use of intoxicating liquors, to the use of which she had long been addicted; that she afterwards was more quiet, but did not improve in health, nor recover from her aberration·of mind. In January she bequeathed all her property to one who was not a relative, or near friend; but who had taken care of her for a short time, at the request of others, on the understanding that she should be paid. The legatee had previously attempted to get $300 from testatrix, and had asked the draughtsman of a former will, after its execution, to insert a clause in her favor. The daughter of the legatee came a long distance to assist in the care of testatrix, to whom she was an entire stranger, and witnessed the execution of the will. Testatrix had also previously made a grant of all her property to the son of the legatee, which was destroyed. She died in February. *Held,* that the will was void for incapacity and undue influence.[1]

Appeal from surrogate's court, Erie county.

Argued before BARKER, P. J., and HAIGHT, BRADLEY, and DWIGHT, JJ.

· *Fullerton, Becker & Hazel,* for appellant.   *W. F. Sheehan,* for contestant, Mary Coakley.   *James C. Beecher,* guardian *ad litem,* and for the heirs at law.

HAIGHT, J. The instrument offered for probate as the last will and testament of Jane Anderson, deceased, bears date January 2, 1884, and bequeaths all of her property, real, personal, and mixed, to Elizabeth Griffin, and appoints her sole executrix. She died on the 9th day of February thereafter, and at the time of her decease was 41 years of age. It appears from the evidence that she was the widow of Patrick Anderson, who died the summer or fall before; and for a long time she had been addicted to the use of strong and spirituous liquors. After her husband died she appears to have given away to its use to such an extent that she was unable to care for herself; that on the day of the funeral she was able to be up and attend the funeral, but on the next day she was confined to her bed, and was most of the time thereafter; that, in November, Mr. Sheehan was called to her house to draw a will for her; that he called at her house three times before he found her in a condition in which he thought she was competent to execute a will; that then he drew a will for her, which was executed, in which she reserved $300 funeral expenses, $700 for a monument for herself and husband, and gave $500 to Sister Martha, of St. Bridget's parish, and $500 to the sisters of the Buffalo

[1]For evidence held to show testamentary mental capacity or incapacity, see In re Bull, *ante,* 52, and note; Elkinton v. Brick, (N. J.) 15 Atl. Rep. 391. See, on the subject of undue influence in the execution of a will, Stockton v. Thorn, (Minn.) 39 N. W. Rep. 43, and note; In re Mondorf's Will, (N. Y.) 18 N. E. Rep. 256, and note.

Catholic Asylum; that, shortly after the decease of her husband, Dr. Mackay was called to attend her, and his visits continued up to the date of her death. He states that at the first time that he saw her she was temporarily insane from the use of intoxicating liquors; that she was in a high state of excitement, and he considered her totally irresponsible; that that was in the beginning of November; that he could not say that she had been on a protected debauch, but she had been using intoxicating liquors, and was in such a condition that he could not talk to her; that at other times when he called he found her somewhat quieter, but she was still ill; that he visited her continuously every day for some time afterwards; that she did not get better, nor did she get over her aberration of mind; that he did not think she would ever recover; that he did not mean to say that she was crazy from the constant use of stimulants, but that her mind was in a feeble condition, and broken down; that he could not properly call it an insane condition, for her mind was so feeble and so weak from the use of stimulants, and from the inroads of her disease, that her powers of thought and memory, or of anything of that kind, were very much deadened, and he did not think she understood clearly everything that was said to her; that she did not always answer questions intelligently, and never improved in her state of health; that she was usually in a sort of half stupid condition. It further appeared that at some time after the making of the first will John M. E. Kinney, an attorney, was called in to make a further will; that he saw her on two or three occasions, but did not draw any will for her to execute; that subsequently, and in December, Mr. Murphy, another lawyer, was called in to make a will for her, and that he drew and she executed, a grant, in which she gave absolutely all of her property to Theophilus Griffin; that subsequently, and on the 2d day of January, the will in question was drawn by Mr. Murphy, and executed by Mrs. Anderson, at which time the grant to Theophilus Griffin, together with the will drawn by Mr. Sheehan, were destroyed. It further appeared from the evidence that Elizabeth Griffin was the mother of Theophilus Griffin; that she had been an acquaintance and friend of Mrs. Anderson's mother-in-law prior to her death; that at the time of Mr. Anderson's death Mrs. Griffin was living in the country; that she came to the city, and went to the house of Mrs. Anderson, and, at the request of Mr. Kelly and Mr. McGuire, the administrator of Mr. Anderson's estate, she stayed to take care of Mrs. Anderson during her sickness. It further appeared from the evidence that during the sickness of Mrs. Anderson a $2,000 draft was delivered to her from the C. M. B. A., a benefit society of which her deceased husband was a member; that Mrs. Griffin was present at the time such draft was delivered, and wanted $300 of the money given to her; that $125 was paid to her, and the balance deposited in the Erie County Savings Bank by Mr. Sheehan; that subsequently another check was presented at the bank, payable to the order of Mrs. Griffin, for $150, payment of which was refused until indorsed by Mr. Sheehan. It further appears that after the execution of the will drawn by Mr. Sheehan Mrs. Griffin went to his house, and asked him to insert a clause or codicil giving her $500, which was refused. The surrogate has found that said will and testament, dated January 2, 1884, is not genuine and valid and duly executed, and that the testator at the time of the execution thereof was not in all respects competent to make a will, and was under restraint and unduly influenced, and not of sound mind, memory, and understanding. Exceptions are taken to such findings.

The main question raised for our consideration is whether or not Mrs. Anderson was of sound and disposing mind and memory at the time of the making of the instrument in question, and as to whether or not she was improperly or unduly influenced to execute it. The evidence with reference to her mental and physical condition is somewhat conflicting. The will was witnessed by Mr. Murphy, the attorney who drew it, and by Agnes Sheehan, a married daughter of Mrs. Griffin, who had some weeks before arrived from

the city of New York, and had taken up her residence at Mrs. Anderson's house. Their testimony would tend to show that she was able to make a will, while, on the other hand, the testimony of the doctor and of the other witnesses would tend to show that she was not in condition in which she could properly make or execute a will. When we take into consideration the mental and physical condition of Mrs. Anderson, as disclosed by the testimony, and the fact that Mrs. Griffin was not a relative or near friend; that she came there a few weeks before Mrs. Anderson's death, and took care of her at the request of friends, with the understanding that she would be paid therefor; the fact that Mrs Sheehan came on from New York, an entire stranger, to assist her mother in such care, with the attempts of Mrs. Griffin to obtain money in the manner already indicated,—taken into consideration with all the other facts and circumstances of the case,—lead us to conclude that the questions of the mental condition and undue influence were properly disposed of by the surrogate. The decree should, consequently, be affirmed, with costs of this appeal. So ordered.

BRADLEY and DWIGHT, JJ., concurred. BARKER, P. J., not voting.